**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No.: 12-CR-0792 YGR** |
| **Plaintiff,** | **PRETRIAL ORDER NO. 15 REGARDING PENDING MOTIONS *IN LIMINE*** |
| **v.** | |
| **HENRY CERVANTES, *et al.*,** | Re: Dkt. Nos. 783, 831, 832, 833, 846, 1021, 1022, 1023, 1024 |
| **Defendants.** | |

Pending before the Court are motions *in limine* and a motion to conduct hearings and issue preliminary rulings on certain categories of evidence, filed by Henry Cervantes ("H. Cervantes") (Docket Nos. 783, 831, 832, 833, 846), and motions *in limine* filed by Andrew Cervantes ("A. Cervantes") (Docket Nos. 1021, 1022, 1023, 1024). Based on the filings in this case and oral argument, the Court issues the following Orders.

I.   **A. Cervantes's Motions *in limine* Numbers 1 and 2, Regarding Testimony about Prior Racketeering Conviction and by Witness John Feeney regarding pre-2004 Racketeering Acts**

In his motion *in limine* number 1, A. Cervantes seeks to exclude evidence of a prior conviction in 1999 "for racketeering, which included an admission of solicitation of murder as a racketeering act, in the Eastern District of California . . . ." (*See* Docket No. 1021 at 1.) In particular, he seeks an order "directing the government to instruct its informant, law enforcement and Bureau of Prisons witnesses to not reveal the nature of Mr. Cervantes' prior conviction, as well as generally precluding testimony on the subject." (*Id.* at 2.) In motion *in limine* number 2, A. Cervantes seeks to exclude evidence of a variety of incidents that occurred before 2004. (*See* Docket No. 1022 at 1–2.) As addressed at the April 8, 2016 hearing, the government may not admit evidence of A. Cervantes's prior conviction or incidents that predate the time period to which the Court has limited the evidence in this case. Thus, the Court **GRANTS** the motions **WITHOUT**

United States District Court
Northern District of California

PREJUDICE to future motions if pertinent to a rebuttal.  *Cf. United States v. Osazuwa*, 564 F.3d 1169, 1176 (9th Cir. 2009) ("'Presenting a theory of the case that can be effectively rebutted by otherwise-inadmissible evidence,' we held, 'does not by itself open the door to using such evidence; only partial, misleading use of the evidence can do so.'" (quoting *United States v. Sine*, 493 F.3d 1021, 1038 (9th Cir. 2007)).  Accordingly, the Court declines to address the merits of the parties' arguments with regard to whether the evidence at issue in these motions would be admissible outside the government's case in chief as premature.  However, by finding in this manner, the government must address the issue with the Court outside the presence of the jury before proffering any such evidence.

II.     **A. Cervantes's Motion *in limine* Number 3 to Exclude Hearsay Statements in Letters, "Kites," and Writings, and H. Cervantes's Motions *in limine* Numbers 5 and 18**

A.   **Criminal Local Rule 16-1(c)(4)**

A. Cervantes seeks an order directing the government to comply with Criminal Local Rule 16-1(c)(4), which states that "the government shall disclose . . . [a] summary of any statement the government intends to offer under F. R. Evid. 801(d)(2)(E) in sufficient detail that the Court may rule on the admissibility of the statement."  N.D. Cal. Cr. Local R. 16-1(c)(4); *see also United States v. Cerna*, 2011 WL 2119304, at *5 (N.D. Cal. May 27, 2011) ("Before trial, the government made a good faith effort to comply with the local rule and the scheduling orders and produced a comprehensive document summarizing over 400 statements, sorted by sponsoring witness.  This was seven weeks before the first witness."); *id.* ("While the local rule and the scheduling orders required advance notice/summaries of coconspirator statements, the purpose of the rule and the orders was to allow for adequate time for the parties to litigate the admissibility of the statements.").  H. Cervantes similarly "seeks an order from this Court requiring that the Government specify the statements it seeks to introduce; the conspiracy that is alleged to be connected with the statement; and that the Court . . . exclude any statement that does not meet the requirements of the rule."  (Docket No. 833 at 4.)   The government's exhibit list is understandably

United States District Court
Northern District of California

comprehensive and the defense's objections in this regard are **DENIED**.  That said, and based upon instructions from this Court, the government previously identified the core documents on which it intended to focus during trial, which contain the statements at issue.  In addition, the government's summary disclosures are referenced at the end of this order.[i]  The objections based on Local Rule 16-1(c)(4) are also **DENIED**.

Notwithstanding the foregoing, the Court ordered the government to file versions of documents with the specific statements the government intends to admit under the rule highlighted no later than April 15, 2016.

### B.  Applicable Law for Particularized Rulings under Rule 801(d)(2)(E)

In filings relating to A. Cervantes's motions *in limine* and H. Cervantes's motions *in limine*, and in argument before the Court, the parties have disagreed as to the proper standard to admit a statement under Rule 801(d)(2)(E).  The Court now explains the standard that applies to each statement the government seeks to admit under the rule.[1]

Under Rule 801(d)(2)(E), a statement is not hearsay if it is "offered against an opposing party and[] . . . was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E).

To fall within this coconspirator exception, "the following preliminary facts must be shown: (1) there was a conspiracy, (2) the defendant and the declarant were participants in the conspiracy, and (3) the statement was made by the declarant during and in furtherance of the conspiracy." *United States v. Bridgeforth*, 441 F.3d 864, 869 (9th Cir. 2006) (footnote omitted); *see United*

---

[1] Because the Court lacks both the specific statements and, with them, either alternative arguments for admissibility or objections particularized to each statement, the Court is not in a position to issue rulings outside the scope of the Rule 801(d)(2)(E) issues A. Cervantes and H. Cervantes have raised.  Also for this reason, the Court is not in a position to rule on the government's attempt to argue that all statements at issue alternatively could be admitted "for purposes other than the truth of the matters asserted," (Docket No. 1052 at 10), or any particular statement's probative value in such an analysis.

1  *States v. Gil*, 58 F.3d 1414, 1420 (9th Cir. 1995).  "The statement alone is insufficient to prove

2  these preliminary facts."  *Bridgeforth*, 441 F.3d at 869.[2]

3     Among the necessary prerequisites to admitting a statement under this exception is that a

4  "party's coconspirator" made the statement: "Before an alleged co-conspirator's statement can be

5  admitted into evidence under Rule 801(d)(2)(E), the government must establish that the declarant . .

6  . knowingly participated in a conspiracy."  *United States v. Liera*, 585 F.3d 1237, 1245 (9th Cir.

7  2009).  In addition, "[t]o establish that the declarant knowingly participated in a conspiracy, 'the

8  government cannot rely solely on the [alleged] co-conspirator statements themselves.'"  *Id.* at 1246

9  (quoting *United States v. Castaneda*, 16 F.3d 1504, 1507 (9th Cir. 1994)); *see also id.* ("Here, the

10 only evidence offered by the government to establish that Le Chen's mother was involved in a

11 conspiracy are the hearsay statements the government sought to introduce regarding what Le

12 Chen's mother told Le Chen.").

13    Further, "before a statement is that of a 'co-conspirator' there must be independent proof of

14 the defendant's and the declarant's status as members of the same ongoing conspiracy.  In order to

15 corroborate or refute this status, the litigants must know the identity of the declarant."  *United*

16 *States v. Mouzin*, 785 F.2d 682, 692 (9th Cir. 1986).  "Of course, identification of the declarant will

17 not, by itself, establish a proper foundation unless the identified declarant is a co-conspirator whose

18 assertions were made in furtherance of and in the course of the conspiracy."  *Id.* at 693.  The Ninth

19 Circuit has recognized *Mouzin*'s application outside the context of drug ledgers.  *See United States*

20 *v. Lloyd*, 807 F.3d 1128, 1155 n.8 (9th Cir. 2015) (citing *Mouzin* in the context of purported Rule

21 801(d)(2)(E) statements made by "unidentified telemarketers").  Moreover, in *Gil*, the government

22 met its burden, in part, by presenting evidence that two specifically identified defendants "were co-

23 conspirators, and prov[ing], by a preponderance of the evidence, that [drug ledgers [sought to be

---

26  [2] *Cf. United States v. Silverman*, 861 F.2d 571, 579 (9th Cir. 1988) ("[A] co-conspirator's
27 out-of-court statements are presumptively unreliable.  When the out-of-court statement is one made
by a co-conspirator purporting to implicate others in an unlawful conspiracy, its reliability is doubly
28 suspect." (citations and footnote omitted)).

United States District Court
Northern District of California

admitted] were the defendants' statements."  *Gil*, 58 F.3d at 1420; *see also id.* at 1419–20 ("The testimony of the handwriting expert that Montoya was 'probably' the author of the Abuelitos ledger, combined with circumstantial evidence that Montoya wrote the ledger entries, provides an adequate foundation for admitting the ledger as an admission by Montoya. . . .  [T]he evidence supported the finding that [the San Bruno ledger] was a statement made or adopted by Gil." (footnote omitted)); *id.* at 1420 (noting evidence regarding the location of the ledgers, "entries [that] corresponded to surveilled activities," and attributions of deliveries to "a nickname associated with an established pseudonym for Gil").  Thus, the government must show that it is more likely than not that the declarant was a co-conspirator.

In addition, "[u]nder this rule, an accused's knowledge of and participation in an alleged conspiracy with the putative coconspirator are preliminary facts that must be established, by a preponderance of the evidence, before the coconspirator's out-of-court statements can be introduced into evidence."  *Castaneda*, 16 F.3d at 1507.  As with the analysis regarding the declarant, "to establish these facts, the government cannot rely solely on the coconspirator statements themselves."  *Id.*  Rather, the government "must produce some independent evidence which, viewed in light of the coconspirator statements, establishes the requisite connection between the accused and the conspiracy.  While the government need show only a slight connection with the conspiracy, the independent evidence must be 'fairly incriminating: . . . .'"  *Id.* (citations omitted).

Finally, as noted above, the statement must be in furtherance of a particular conspiracy.  *See, e.g.*, *United States v. Moran*, 493 F.3d 1002, 1010 (9th Cir. 2007) ("Statements made for personal objectives outside the conspiracy or as part of idle conversation are not admissible under Rule 801(d)(2)(E).  However, 'statements made to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance' of requirement.'" (citations omitted)); *United States v. Cerna*, 2011 WL 2119304, at *3 (N.D. Cal. May 27, 2011) ("In a myriad of ways, the statements sought to further the conspiracy's common objective and/or to set in motion transactions that were integral to the conspiracy.").

Here, the Court is satisfied, given its knowledge of the case and many of the documents that have been submitted, that the government has made a sufficient proffer as to the each of the named defendants' potential for involvement in the charged conspiracy, and with respect to those categories of evidence for which the Court has denied motions to exclude wholesale.  However, with respect to those alleged coconspirators not charged, e.g., Skip Villanueva, a sufficient proffer has not been made.  Given the template the Court has outlined for resolving these matters, the Court does not believe that a separate hearing in advance of opening statements will be necessary and that these matters can be dealt with either before or after a trial day.  If the parties collectively agree that more certainty is required on this front, the Court will entertain a joint request to conduct further proceedings on this issue in advance of trial.

III.    **A. Cervantes's Motion *in limine* Number 4 to Exclude Proffered Expert Opinion Testimony**

First, A. Cervantes seeks to preclude Anthony Garrow from opining on the stabbing of Tobias Vigil, separate from "translation" testimony regarding coded words in particular documents. The government agrees that it may not elicit such opinions for its case-in-chief, resolving the matter as raised in this motion *in limine*.  (*See* Docket No. 1063 at 1; Docket No. 1045 at 4–5.)  This portion of the motion is GRANTED as to the government's case-in-chief.

Second, A. Cervantes requests a hearing to determine the admissibility of individual opinions and Feeney's methodology and, in the alternative, moves to exclude proffered opinions from Feeney that the government in its numbered expert opinion filing characterizes as expert testimony under Rule 702, but which could not meet the requirements of that rule and Ninth Circuit case law on expert "translations."

This Court previously identified multiple categories of "translation" opinion testimony, found that the government's initial disclosures as to Feeney's proffered opinions conflated expert and lay opinion testimony, and ordered the government to file Feeney's proffered expert opinions and lay opinions for purposes of meeting the Ninth Circuit's requirements for admitting each type

of opinion in the context of police officer opinion testimony about coded jargon testimony. *See* Docket No. 928 at 8–11; *United States v. Gadson*, 763 F.3d 1189, 1210 (9th Cir. 2014); *United States v. Vera*, 770 F.3d 1232, 1241 (9th Cir. 2014); *United States v. Freeman*, 498 F.3d 893, 902 (9th Cir. 2007); *United States v. Decoud*, 456 F.3d 996, 1014 (9th Cir. 2006).

The government's updated filing proffers five hundred seventy-six "coding" opinions. (*See* Docket No. 985.)  The Court ordered identification of each opinion sought to be admitted as expert or lay testimony, and the government once again takes the approach that each opinion constitutes expert testimony. (*See id.*; Docket No. 928 at 11.)[3]  Having reviewed the filing, the Court finds that virtually all of the "opinions" relate to investigation-specific terms that lack any fixed meaning or that fall outside the category of commonly-used slang or jargon, and for which Feeney does not explain how his opinions result from a reliable expert methodology. *See Gadson*, 763 F.3d at 1210 (describing testimony about a nickname as "investigation-specific opinion testimony . . ."); *Freeman*, 498 F.3d at  902–05 (identifying and considering concerns "that arise when a case agent goes beyond  interpreting code words as an expert and testifies as to the defendant's conduct based upon the agent's knowledge of the case," including that "'[s]ome jurors will find it difficult to discern whether the witness is relying properly on his general experience and reliable methodology, or improperly on what he has learned of the case'").  For instance, the government once again would have Feeney testify as an expert to what individual nicknames matched which defendants or alleged coconspirators in this case on the basis of listening to calls in this case. (*See, e.g.*, Docket No. 985 at 3; Docket No. 1045 at 4.)

On their face, most of the opinions do not appear to constitute "commonly used" slang. Rather, they appear to be terms the meaning for which Feeney seeks to discern from his investigation of the *Nuestra Familia* organization itself, and this case, in particular. *Compare Vera*, 770 F.3d at 1241 ("Officers may testify about their interpretations of 'commonly used drug jargon'

---

[3] The prior order noted the different analysis that applies to lay opinion testimony as opposed to expert opinion testimony. (*See* Docket No. 928 at 9–10.)

United States District Court
Northern District of California

based solely on their training and experience.") *with id.* ("To interpret the meaning of coded language encountered for the first time in the specific investigation at issue, however, an officer's qualifications, including his experience with narcotics investigations and intercepted communications, are relevant but not alone sufficient to satisfy Federal Rule of Evidence 702.").

Moreover, to the extent Feeney would attempt to testify as an expert decoding terms he encountered for the first time in his investigation of the *Nuestra Familia* organization (and related entities), he fails to explain a method that would satisfy the requirements of Rule 702 under Ninth Circuit case law.  The government's argument that Feeney is "reading[,] or listening to, the repetition of words and phrases over hundreds of hours, as well as the context of such language," (Docket No. 1045 at 3) does not suffice.  "Rule 702 requires district courts to assure that an expert's *methods* for interpreting the new terminology are both reliable and adequately explained." *Vera*, 770 F.3d at 1241.  "'[V]ague and generalized' explanations are not sufficient; rather, the officer must explain how he *applies* his 'knowledge to interpret particular words and phrases used in particular conversations.'"  *Id.* (quoting *United States v. Hermanek*, 289 F.3d 1076, 1093 (9th Cir. 2002)); *see also United States v. Williams*, 2016 WL 899145, at *8 (N.D. Cal. Mar. 9, 2016) ("That gang expert testimony on symbols, code words, and the like has generally been admitted in this district does not mean that it is admissible irrespective of its reliability or helpfulness to the jury.").  In *Decoud*, for instance, "the expert gave a lengthy explanation of how he interpreted 'diznerty' based on his understanding of a common speaking style . . . [that adds 'e' or 'ez' to words.]."  *Decoud*, 456 F.3d at 1014 n.6.

For ease of reference, the Court has categorized the opinions at issue:

First, the only numbered opinions which do not appear, on their face and read alongside the government's August 17, 2015 disclosure, to be based upon Feeney's investigation of this particular organization are as follows:[4] Opinion Numbers 9; 10; 11; 13; 14; 15; 16; 21; 22; 23; 36

---

[4] Although the August 2015 disclosure references specific individuals, facts about *Nuestra Familia*, and *Nuestra Familia* policies in describing the context for certain translations, the Court

United States District Court
Northern District of California

(except for perhaps "weather," which appears investigation-specific according to page 1 of the August 2015 disclosure, and Nephews, which appears investigation-specific according to Opinion Number 233); 37; 39; 41; 42; 44; 45; 62; 63; 64; 68; 70; 71; 73; 75; 77; 78; 81; 83; 85; 87; 88; 91; 92; 94; 98; 99; 102; 103; 105; 109 (to the extent not referring to "Norteños and Sureños"); 110; 111; 112; 113; 114; 116; 117; 119; 120; 124; 127 (to the extent there possibly could be a basis distinct from the explanation specific to Rico Garcia); 128; 132; 148; 154; 155; 156; 157; 158; 161; 166; 170; 174; 175; 178; 190; 191; 196; 199; 205; 206; 207; 213; 214; 219; 220; 221; 224; 226; 228; 230; 232; 233 (except for "Nephews, out of loyalty, the Nephews"); 234; 235 (except for "rotations"); 236 (to the extent there possibly could be a basis distinct from the explanation about Rangel); 237; 239; 240; 242; 245 (to the extent there possibly could be a basis independent of translating "rotations"); 246; 260; 261; 262 (except for references to "Brenda" and "Rosa"); 267; 269 (except for reference to "Brenda" and only to the extent there possibly could be a basis for translating "heat" as distinct from the investigation-specific basis provided for "weather" in the August 2015 disclosure); 273; 275; 288; 289; 290; 291; 293; 295; 308; 309; 310; 311 (except for reference to "Brenda"); 312 (except for reference to "Rosa"); 313; 314; 315; 323; 325 (only to the extent explaining that "Josie is [a] reference to Outlaw Josie Wales[—]movie in which main character rode a horse"); 329 (except for reference to "Guenia"); 344; 346 (except for reference to "Guenia" and, as in number 127, only to the extent there possibly could be a basis distinct from the explanation specific to Rico Garcia); 352; 354; 355; 358; 361; 367; 378; 383; 391; 401; 402; 406; 437; 438; 440; 443; 467; 468; 482; 483; 484; 486; 487 (only if the basis for translating "heat" is distinct from the possibly investigation-specific basis provided for the "weather" opinion in the August 2015 disclosure); 495 (to the extent it does not reference "Cervantes"); 501 (to the extent it does not reference "Cousin Casper"); 524; 537; 555; 560; 565; and 571 (to the extent it has a basis

---

does not understand the government to seek to admit such information as translations for the particular word or phrase to be decoded in each instance and, thus, does not address here issues that might arise from such references.

9

United States District Court
Northern District of California

independent of "the stabbing" as a particular stabbing).  Thus, these opinions might possibly be admissible as expert testimony if the government demonstrates for each coded word to be translated how it meets the Rule 702 and pertinent case law requirements.  Still, because the Court lacks bases for these opinions, the Court is not in a position at this time to rule on their admissibility one-by-one.

Second, the following opinions do not appear on their face to be based upon Feeney's investigation of this particular organization, *but* the government's August 2015 disclosure suggests that in fact they might be: Opinion Numbers 1; 2; 7; 8; 17; 18; 19; 32; 53; 58; 59; 72; 74; 76; 79; 82; 84; 86; 89; 92; 151; 184; 187; 188; 243; 259; 270; 278; 294; 438; 476; 485.[5]  Because of the information contained in the August 2015 disclosure, the Court also **RESERVES** ruling on these opinions.  If the government demonstrates that these opinions might possibly be admissible as expert testimony, then, as explained in the paragraph above, the government would need to demonstrate for each coded word to be translated how it meets the Rule 702 and pertinent case law requirements.

Finally, all of the remaining opinions—not identified in the two paragraphs above—are investigatory, or otherwise could not satisfy Rule 702's requirements because no translation is given or a given translation is the same as the phrase supposedly in code.  The Court addressed the law relative to this issue previously.

Under current Ninth Circuit law, the Court would need to evaluate the remaining opinions under Rule 701.  For example,[6] Opinion 517 reads: "Tell Polvo that Demonito is a waste of time and mom doesn't want her around the house, period."  (Docket No. 985 at 35.)  The proffered expert "translation" reads: "Call Ernest Killinger (aka Polvo/Powder) and tell him that Tobias Vigil (Demonito) is not fulfilling his obligations and is no good.  He is not welcome in the prisons.  Have

---

[5] *See* August 17, 2015 Disclosure, Ex. A at 1; 1–2; 5–6; 6–7; 12; 12–13; 13–14; 20–21; 24; 24; 24; 12; 12; 26; 26; 12; 12; 26; 26; 28; 40–41; 55; 56; 56–57; 71; 73; 75; 76–77; 82; 14; 20–21; 1.

[6] The examples the Court discusses from the government's numbered opinions filing are illustrative, not exhaustive.

him hit, stabbed, killed." (*Id.*) This proffered translation falls squarely within the rubric of one constituting "lay opinions about the meaning of intercepted phone calls, . . . subject to the requirements of Federal Rule of Evidence 701," *Vera*, 770 F.3d at 1242; *see also Gadson*, 763 F.3d at 1210. It does not indicate which—if any—words in that call constitute commonly used slang or jargon, which words were newly heard by Feeney in this investigation, and, for the latter, what particular methodology he applied to translate each particular "coded" word. *See Vera*, 770 F.3d at 1241. *Cf. Williams*, 2016 WL 899145, at *6 ("To the extent that they are relevant and not unduly prejudicial, Sgt. Jackson may give his opinions regarding common slang.").

Further, the Court agrees that some of Feeney's purported translations attempt to cast as "code word" translation what in fact is the type of testimony about *Nuestra Familia* structure, *Nuestra Familia* rules, and individuals' roles in *Nuestra Familia* that the Court previously excluded. (*See* Docket No. 1070 at 3 n.1.) For example, Feeney translates the words, "The poem 'Back to Basics,'" to mean "The rules Cervantes implemented for all." (Docket No. 985 at 37, Opinion Number 546.) For "cream of crop," the government's August 2015 disclosure includes the sentence: "The NF has a policy not to take people under their wing just for numbers[,] but rather quality. It's their reputation at stake." (August 17, 2015 Disclosure, Ex. A at 10.) Feeney also translates the words, "Take care of her things to do list for the summer," to mean "Hit (kill) Demon." (Docket No. 985 at 37, Opinion Number 553.) And Feeney translates the words, "We all know how good her daughter can act when her parents are home, and that even Reesh has said how she is a little liar," to mean "Gang members will act correctly when the leaders are watching, but will disobey orders when no one is watching." (*Id.* Opinion Number 541.) These examples illustrate how Feeney seeks to go beyond translating particular words with fixed meanings and opine about the origin and effect of a *Nuestra Familia* document, *Nuestra Familia* rules, the expectations of *Nuestra Familia* members, and particular actions by particular individuals holding particular positions within *Nuestra Familia*. The Court already has held these types of opinions to be improper expert testimony. (*See* Docket No. 928 at 13–16; *id.* at 8–12.)

United States District Court
Northern District of California

Moreover, to the extent the government now claims that Feeney is interpreting codes that are "more 'prison code' than 'nf code,'" and that he bases his opinions on "'years of listening to this guys [sic], not just the nf but prisoners,'" a sufficient proffer has not been made. (*See* Docket No. 1024 at 4 (some quotation marks omitted).)  The government's disclosure stated, "At the Bureau of Prisons, Mr. Feeney's primary responsibility was to monitor gang activity, including activity of the *Nuestra Familia*."  (Docket No. 1045 at 5.)  Not included in that basis for Feeney's opinions was information about other gangs he monitored and what such monitoring entailed such that it would apply to his proffered opinions.  Previously, the Court found that Feeney's disclosures set out his experience investigating *Nuestra Familia* for eight years, without indicating whether Feeney's experience extended beyond the *Nuestra Familia*.  (*See* Docket No. 928 at 10.)

As the Court finds that only a small portion of the proffered opinions might be classified as expert and not investigatory, i.e., lay opinion, the Court need not conduct a separate hearing to address their admissibility at this time.  The Court may do so within the confines of the time afforded for trial and outside the presence of the jury.  *See Hermanek*, 289 F.3d at 1095 n.7.

The Court next addresses the specific arguments regarding the exclusion of the home address associated with Karen Bauer.  (*See, e.g.*, Docket No. 985, Opinion 320 ("Karen Bauer is intermediary for letters t/from Cervantes and Villanueva.  Compare NF 544, 545 and NF 11190, 11191.").)  The government's opposition on this point is conclusory.  (*See* Docket No. 1045 at 5.) To the extent the government seeks to admit evidence that A. Cervantes and Sheldon Villanueva sent letters to an individual named "Karen Bauer," and the government seeks to admit as expert testimony that they were using Bauer's address as an intermediary, the government fails to explain how "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702; *see* Docket No. 1024 at 8.  Also, previously, this Court excluded "opinions identifying specific individuals holding positions in *Nuestra Familia* . . . or the fact of occurrences tied to *Nuestra Familia* . . . ."  (Docket No. 928 at 15.)  The Court once again stresses the distinction between "sociologist describing the

inner workings of a closed community" and "a chronicler of the recent past whose pronouncements on elements of the charged offense serve as shortcuts to proving guilt," *United States v. Mejia*, 545 F.3d 179, 190 (2d Cir. 2008). Interpreting the facts and opining as to why individuals sent letters to Bauer fit into the latter category and identify a specific individual with a specific role. *See United States v. Garcia*, 793 F.3d 1194, 1213 (10th Cir. 2015) ("[I]f '[t]he jury [is] every bit as qualified to analyze' a piece of mundane evidence as the purported expert, the expert provides no added value on which to be cross-examined." (quoting *United States v. Benson*, 941 F.2d 598, 605 (7th Cir. 1991)). Thus, the Court excludes expert testimony regarding the Bauer address under Rule 702.

In sum, the Court **GRANTS IN PART AND DENIES IN PART** A. Cervantes's motion *in limine* number 4. Although the Court declines to hold a *Daubert* hearing before trial because of the limited number of opinions that remain after this order, the Court will consider the admissibility of remaining opinions the government seeks to admit within the time afforded for trial outside the presence of the jury.

## IV.   **H. Cervantes's Motion *in limine* Number 3 Regarding Acts or Statements Prior To Proven Entry Into Any Charged Conspiracy or To Proof Of Any Conspiracy Charged**

H. Cervantes moves for a ruling "that both the nature of a conspiracy, and the timing of an individual's joining of a conspiracy, must be considered in deciding what a conspirator is allegedly liable for under the conspirator liability rules." (Docket No. 831 at 3.) The Court **GRANTS** this motion to the extent the Court will entertain specific requests for pertinent jury instructions, and otherwise **DENIES** the motion as overly broad **WITHOUT PREJUDICE** to objections particularized to acts or statements the defense seeks to exclude.

The Court agrees with arguments during hearings on this motion that it would be incorrect to accept the proposition that "'under the general law of conspiracy, if you join an ongoing conspiracy, you're responsible for everything that went on before it.'" *United States v. Garcia*, 497 F.3d 964, 967 n.1 (9th Cir. 2007). The Court also recognizes the general premise that "a defendant cannot be held criminally liable for *substantive offenses* committed by others involved in the

conspiracy before joining it or after ending participation in the conspiracy.'" *Id.* (quoting Robert R. Arreola et al., Federal Criminal Conspiracy, 34 Am.Crim.L.Rev. 617, 628–29) (emphasis in original). *Cf. id.* ("*In establishing liability for the conspiracy charge*, the circuit courts generally find conspirator liability for *acts* committed by co-conspirators both prior to, as well as during the defendant's participation." (quoting Arreola, 34 Am. Crim. L. Rev. at 628–29) (emphasis in original)). However, the Court also recognizes that the conspiracy alleged is much broader than the defendants would like to admit.

Further, basic statements of law stemming from *Pinkerton v. United States*, 328 U.S. 640 (1946) are not in dispute. Thus: "'due process constrains the application of *Pinkerton* where the relationship between the defendant and the substantive offense is slight,' and . . . a *Pinkerton* instruction would violate due process [in a case where there only was a] slight connection between [a] [defendant] and [a] conspiracy.'" *Gadson*, 763 F.3d at 1216 (quoting *Castaneda*, 9 F.3d at 766, 768); *see also United States v. Green*, 592 F.3d 1057, 1071 (9th Cir. 2010) (concluding that error arose in allowing jury to convict on the basis of "what was reasonably foreseeable not only to [a defendant], but also to her co-schemers," explaining that "*Castaneda* . . . established that vicarious liability must be predicated on acts that were reasonably foreseeable to the defendant."). The question to be addressed during the discussion of the instructions is the extent to which any argument can be made that only a "slight connection" existed amongst the alleged conspirators.

Finally, with regard to conspiracy liability, if the government seeks to admit coconspirator statements made prior to H. Cervantes's entry into a charged conspiracy—proven by independent evidence—then any purposes for which the jury may consider any such statements must be limited. *See United States v. Gee*, 695 F.2d 1165, 1169 (9th Cir. 1983) ("Statements of alleged co-conspirators made before the time it can be shown by independent evidence that [a defendant] had joined the conspiracy are not admissible to show his participation."); *United States v. Segura-Gallegos*, 41 F.3d 1266, 1272 (9th Cir. 1994) (citing *Gee* to distinguish between impermissible

14

United States District Court
Northern District of California

1  admission of coconspirator statements to show a defendant's participation in a conspiracy and

2  admission of such statements for separate purposes).

3        Accordingly, the Court will consider particularized objections and arguments for jury

4  instructions, but H. Cervantes has not yet provided either for purposes of considering whether to

5  exclude any evidence pursuant to this motion. *See Luce v. United States*, 469 U.S. 38, 40 n.2

6  (1984) (noting that motion *in limine* refers "to any motion, whether made before or during trial, to

7  exclude anticipated prejudicial evidence before the evidence is actually offered").

8  **V.     H. Cervantes's Motion *in limine* Number 4 Regarding Alleged Conspiratorial Acts
9         Or Substantive Crimes Committed By Other Individuals After H. Cervantes's
10        Arrest In September 2011**

11       H. Cervantes seeks to exclude any evidence regarding actions on any date after H.

12 Cervantes's arrest in September 2011, or to provide limiting instructions on the purpose for which

13 the jury may consider such evidence. (Docket No. 832 at 1–2.) Further, to the extent the

14 government argues that H. Cervantes's actions after his arrest demonstrate continued participation

15 in the conspiracy, he seeks to exclude such evidence under Rule 403. (*Id.*) As with H. Cervantes's

16 motion *in limine* number 3, the Court **GRANTS** this motion to the extent the Court will entertain

17 specific requests for pertinent jury instructions, and otherwise **DENIES** it as overly broad **WITHOUT**

18 **PREJUDICE** to objections particularized to acts or statements the defense seeks to exclude. *See*

19 *Garcia*, 497 F.3d at 967 & n.1; *United States v. Cruz-Ramirez*, 2011 WL 5599630, at *5 (N.D. Cal.

20 Nov. 17, 2011) ("Nonetheless, to ensure no juror confusion, the undersigned instructed the jurors at

21 the time evidence was admitted of the limited purpose of the evidence and the fact that most of the

22 defendants on trial were in custody at the time of the incident. The undersigned similarly instructed

23 the jury at the end of the case that the fact that a defendant was incarcerated necessarily meant he

24 could not have been present at the scene of the crime.").

25

26

27

28

United States District Court
Northern District of California

## VI. Conclusion

This order terminates Docket Nos. 783,[7] 831, 832, 833, 846, 1021, 1022, 1023, and 1024.

**IT IS SO ORDERED**.

Date: April 15, 2016

**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[i] (1) 2nd Expert Disclosure Letter of August 17, 2015 with attachments:
    a. Prison calls decoding by expert.
    b. Prison call summaries.
(2) Discovery Letter of August 21, 2015, enclosing the follow relevant documents:
    a. Transcriptions of previously produced jail calls, marked with bates numbers NF-009504 to NF-010878
    b. Transcript of a previously produced recording from October 8, 2012, marked with bates numbers NF-010879 to NF-010947.
    c. Jail letters and audio recordings relating to Andrew Cervantes, marked with bates numbers NF-010948 to NF-011796.
    d. Jail kites, marked with bates numbers NF-011827 to NF-011854.
    e. Spanish to English translations of previously produced jail letters, marked with bates numbers NF-012002 to NF-012014.
(3) Jail Letter Index of August 21, 2015.
(4) A second Discovery Letter of August 21,2015 disclosing its intention to introduce at trial:
    a. Jail Calls involving Andrew Cervantes, Sheldon Villanueva, Alberto Larez, Henry Cervantes, Fernando Rangel and others (NF 009504 to NF 010878).
    b. Recording of meeting involving Alberto Larez and other members of Nuestra Familia on October 8, 2012 (NF 10879 to NF 010947).
    c. Letters translated from Spanish (NF 012002 to NF 012014).
    d. All statements made by Andrew Cervantes, Sheldon Villanueva, Alberto Larez, Henry Cervantes, Fernando Rangel and others in jail calls, itemized, transcribed and produced to you, as de-coded by John Feeney. Please see the exhibits to the United States' Second Expert
    Disclosure, which provide detailed summaries of the content of the jail calls.
    e. All statements made by Alberto Larez and others present at the October 8, 2012 meeting in which Nuestra Familia business is discussed and in which Alberto Larez states he is "the channel out here [on the streets]," states he is a "CAT II," and states he is in contact with and taking orders from Nuestra

---

[7] In Docket No. 783, H. Cervantes sought hearings for preliminary rulings on writings, the contents of cell phones, and statements attributed to defendants in this case. In light of the Court's rulings in this order and the lack of specificity regarding cellular phone data in the motion, the motion is **DENIED** as moot and overbroad.

1  Familia leadership including Sheldon Villanueva, Andrew Cervantes, Joseph
   Hernandez, and Tristan Cornelio (NF 010879 to NF 010947).
2  f. Letters written by Andrew Cervantes, Skip Villanueva, Alberto Larez,
   Henry Cervantes and others, as identified by Bates number in an attachment
3  to this disclosure (NF 010948 to NF 011796; NF 000478 to NF 000563; NF
   003018 to NF 003227; NF 008433 to NF 008439; NF 003231 to NF
4  003320).
   g. Filters, kites, code keys, and other written communications seized from
5  Andrew Cervantes's cell, including a filter entitled "Back to Basics" written
   in Andrew Cervantes's hand writing (NF 010948 to NF 011796).
6  h. Filters, kites and other written communications seized from Alberto
   Larez's residences on Seminary Avenue and Red Bluff.  These
7  communications include Nuestra Familia training materials, the constitution,
   the 14 Bonds, writing carved into photographs and/or writing on the back of
8  photographs, messages hidden in elaborate drawings, and other writings of
   Alberto Larez and/or other Nuestra Familia members (material is in physical
9  evidence and is being processed for disclosure).
   i. Statements made by Angel Martinez, Alberto Larez and "Flacco"
10 regarding the murder of Martin Chacon. Martinez statements include "Kung
   Fu is dead" (made before the murder); "that was a mob hit" (describing the
11 murder after the fact); and a statement that Chacon was telling people in San
   Jose that he was running San Jose.  Larez['s] statements include "we're
12 killing Kung Fu;" a statement that he was "doing a surveillance check"
   moments before the Chacon murder; and a statement after the murder that
13 Joseph Oakes was promoted for his participation in the murder.
14 (5) Disclosure Letter of August 26, 2015, including the following:
       a. First, we plan to introduce statements made by Andrew Cervantes to his
15     pre-trial services officer on March 24, 2015.  He told the officer he was a
       member of the Nuestra Familia organization both in and out of prison.  He
16     also offered the statement that Nuestra Familia is an organization and not a
       gang because it does not engage in "ignorant stuff."
17     b. Second, we also intend to introduce co-conspirator statements obtained
       from the testimony of cooperating witnesses.  We will produce these
18     statements at the time ordered by the Court for the disclosure of cooperating
       witnesses and/or under an appropriate protective order.
19 (6) Disclosure Letter to Counsel for Andrew Cervantes of December 3, 2015, with
20 all of the above information and the following disclosures:
       a. Please consider all the co-conspirator statements outlined in the August 21
21     and 26 letters as incorporated herein by reference.
       b. As those disclosures state, the United States intends to use filters, kites,
22     code keys and other written communications seized from defendant Andrew
       Cervantes's cell, including a filter entitled "Back to Basics" written by
23     Andrew Cervantes (NF 008462 to NF 008559).
       c. As previously disclosed, all statements made by Andrew Cervantes and
24     others in jail calls, itemized, transcribed and produced to you, as de-coded by
       John Feeney.  Please see the exhibits to the United States' Second Expert
25     Disclosure provided to you in my September 9 email, which provide detailed
       summaries of the content of the jail calls and letters written by Andrew
26     Cervantes (NF 010948 to NF 011796; NF 000478 to NF 000563; NF 003018
       to NF003227; NF 008433 to NF 008439; NF 003231 to NF 003320).
27 (Docket No. 861 at 2–4.)
28