United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **Case No.: 12-CR-0792 YGR** |
| **Plaintiff,** | **TRIAL ORDER NO. 6 REGARDING** |
| **v.** | **A. CERVANTES'S *MASSIAH* MOTION** |
| **HENRY CERVANTES,** *et al.*, | **RE: DKT. NOS. 1137, 1259** |
| **Defendants.** | |

Pending before the Court is Andrew Cervantes's ("A. Cervantes") motion *in limine* to exclude alleged admissions due to a violation of his Sixth Amendment rights as first pronounced in *Massiah v. United States*, 377 U.S. 201 (1964). (Docket No. 1137, "Mtn.")[1]  Alberto Larez ("Larez") joined in the motion and requested that the Court exclude admissions he allegedly made. (Docket No. 1140.)  The government opposed the motion.  (Docket No. 1196.)  The Court held an evidentiary hearing on June 10, 2016, after which it **DENIED** the motion with regard to Larez. (Docket No. 1140.)  The Court heard argument on the motion with regard to A. Cervantes on Tuesday, June 14, 2016.[2]  Based on the submissions of the parties, testimony at the hearing, and oral argument held, the Court **DENIES** A. Cervantes's motion.

---

[1] Also pending before the Court is a motion to quash subpoenas issued by the parties or to limit the testimony of Deputy Sean A. Sullivan filed by the Alameda County Sheriff's Office. (Docket No. 1259.)  The arguments made therein were considered by counsel and not broached during the evidentiary hearing.  Accordingly, the County's motion is **DENIED AS MOOT**.

[2] The Court invited counsel for Larez to provide further argument on his joinder in the motion, which counsel declined.  (6/14/2016 Transcript at 5195.)

United States District Court
Northern District of California

I.     **BACKGROUND AND FACTUAL FINDINGS**

"At some point in 2014 or 2015, Protected Witness No. 2 (PW2) dropped out of [N]orteño gang life." (Mtn. at 2 (quoting government's disclosure letter).)  At the time, PW2 was incarcerated in a Bureau of Prisons ("BOP") facility in Arkansas when he began a debriefing process to determine whether his request to drop out was genuine.  BOP Special Investigative Service Agent Kevin Myers, the official in charge of the debriefing process, contacted FBI Agent Laritza Diazgonsen, who in turn contacted FBI Special Agent Dale Dutton to advise that PW2 was interested in cooperating.

A.  **Transfer of PW2 to Northern District of California**

The Court finds that, in 2014, PW2 informed Agent Myers of a desire to drop out of the Norteño gang.  (6/10/16 Transcript at 5112–13.)  PW2 began a process to "debrief," and wanted assistance from counsel in so doing and in meetings with Agent Myers.  (*Id.* at 5121–24, 5129–30.)  PW2 planned to request a reduction in sentence if he provided information "pertaining to things in [his] organization that [he] knew about and things that [he] knew about on the yard, things [he] knew about with the drug movement, things of that nature, if [he] did go that route and . . . put [his] life on the line, . . . ."  (*Id.* at 5126–27.)  PW2 wanted to talk with his attorney about requesting from a prosecutor a reduction in the sentence he then was serving.  (*Id.* at 5128.)  PW2 understood that there was no agreement to receive a reduced sentence at the time he started the process to "debrief" with Agent Myers.  (*Id.* at 5130.)  Agent Myers had six meetings with PW2 in Arkansas, and Myers and PW2 discussed unsolved homicides and other crimes in the Santa Rosa area.  (*Id.* at 5175.)  PW2 also discussed with Myers *Nuestra Familia* and Norteño activities, as well as A. Cervantes, Henry Cervantes, Richard Martinez, and Larez, all of whom are defendants in this case.  (*Id.* at 5175–76.)  In October 2014, Myers had a phone call with FBI Special Agent Russell Nimmo, in which he said that PW2 had information about Larez.  (*Id.* at 5160.)  Also that month, Special Agent Nimmo emailed that information to Assistant U.S. Attorneys Katy Haun, Joseph Alioto, and Will Frentzen.  (*Id.* at 5160–61.)

United States District Court
Northern District of California

1    Next, FBI Special Agent Dale Dutton decided to have PW2 transferred to this District to

2  provide information about prior criminal activity related to Norteños in the North Bay, including

3  unsolved homicides, drug trafficking, and other crimes related to Norteños.  Special Agent Dutton

4  had been involved in PW2's earlier prosecution for drug trafficking, which resulted in a conviction

5  and a sentence PW2 was serving in a BOP facility in Arkansas.  (*See id.* at 5035–38.)  Special

6  Agent Dutton learned in October or November 2014 from another FBI agent that PW2 wanted to

7  cooperate with the federal government and expressed some interest in what PW2 had said "if

8  [PW2] was cooperating or . . . [had debriefed] or provide[d] information in an interview. . . ."  (*Id.*

9  at 5037–38.)

10    Special Agent Dutton also spoke with Agent Myers who debriefed with PW2 in Arkansas.

11  (*Id.* at 5044.)  However, Agent Myers did not brief Special Agent Dutton or Assistant U.S.

12  Attorney Leung on specific information that PW2 had provided other than to indicate that PW2's

13  information related to Norteños.  (*See id.* at 5043–44.)  In fact, neither Special Agent Dutton nor

14  Assistant U.S. Attorney Leung spoke to PW2 about providing information or debriefing until

15  October 2015.  (*See id.* at 5059, 5087.)  Rather, Special Agent Dutton advised Assistant U.S.

16  Attorney Wilson Leung that he was interested in obtaining information regarding some unsolved

17  murders and drug dealing in the North Bay or Santa Rosa area.  (*Id.* at 5040–42.)  On this basis,

18  Assistant U.S. Attorney Leung initiated the paperwork to bring PW2 to Northern California.  (*Id.*)

19  Special Agent Dutton contacted Assistant U.S. Attorney Leung to inform him that: PW2 "has

20  dropped out and . . . is cooperating, and it might be worthwhile for us to see if we can get him

21  moved to the Northern District so we could actually conduct a proffer session."  (*Id.* at 5039.)

22  Dutton knew him to be "a somewhat significant [Norteño] gang member up in the North Bay, and

23  [he and Assistant U.S. Attorney Leung] had hopes that [PW2] could give [them] some information

24  on maybe some unsolved homicides and other criminal activity up there."  (*Id.* at 5040.)  Special

25  Agent Dutton also thought that PW2 possibly could provide information about Norteño-related

26  "assaults and maybe some drug trafficking activity."  (*Id.* at 5042.)  Special Agent Dutton assumed

27

28

1   that PW2 sought a reduction in his prison sentence in exchange for providing information.  (*Id.* at

2   5047–48.)

3          Separate from PW2, Special Agent Dutton knew that A. Cervantes "was an NF member

4   [who had] been arrested on federal charges," and assumed that he was housed at Glen Dyer Jail

5   "because that's where most federal inmates are housed."  (*Id.* at 5052–53.)  Special Agent Dutton

6   had a general awareness of the underlying case against A. Cervantes in August 2015.  (*Id.* at 5053.)

7   At that time, Special Agent Dutton was not involved in the investigation of the instant case, nor did

8   he work in the same office as Special Agent Daniel Daley.

9          As noted, Assistant U.S. Attorney Leung initiated PW2's transfer to this District to facilitate

10  discussions with FBI agents regarding information about prior criminal activity, including unsolved

11  murders in the Sonoma County area potentially involving Norteños and Sureños.  Assistant U.S.

12  Attorney Leung explained: "[T]he usual procedure is, if . . . [PW2] provides information, we would

13  consider giving him consideration in the form of a sentencing reduction, a Rule 35 motion, . . . ."

14  (*Id.* at 5084.)  Previously, Assistant U.S. Attorney Leung prosecuted PW2 in 2013 on drug

15  trafficking and firearms charges.  (*Id.* at 5073–74.)  He had been told that PW2 was a Norteño.  (*Id.*

16  at 5074.)  And he learned from Special Agent Dutton in early 2015 of PW2's willingness to drop

17  out and provide information regarding "some unsolved gang related murders in Sonoma, and . . .

18  assumed . . . Norteño and Sureño[] [involvement]."  (*Id.* at 5074–75.)  Then, he prepared a "Form

19  475" to request that the Bureau of Prisons transfer PW2 to the Northern District of California.  (*Id.*

20  at 5076–78.)  Completing a Form 475 does not involve control over where an individual to be

21  transferred will be housed before arriving at a designated location.  (*Id.* at 5089–90.)

22         After Assistant U.S. Attorney Leung learned that PW2 was scheduled to arrive in the

23  Northern District in early August 2015, he contacted PW2's counsel about PW2's potential

24  cooperation, but did not receive confirmation from counsel about whether PW2 would cooperate.

25  (*Id.* at 5079–82.)  PW2's counsel stated in response to Leung's questioning that he would meet with

26  his client.  (*Id.* at 5081–82.)  PW2 arrived at Glen Dyer Jail in August 2015.

27  ///

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1        B.  **Housing of A. Cervantes and PW2 at Glen Dyer Jail**

2        The government arrested A. Cervantes at a BOP facility in Lewisburg on March 24, 2015,

3 and, on April 9, placed him in Glen Dyer Jail for arraignment on one count of drug conspiracy.

4 (*See* Docket No. 1196 at 2; *United States v. Cervantes*, No. 15-cr-00230-YGR, Docket Nos. 1

5 (March 2015 Complaint), 8 (April 2015 Indictment).)  At the time of A. Cervantes's placement at

6 the jail, Larez had been indicted in this case and was housed at a facility in Pahrump, Nevada.  (*See*

7 Docket No. 1140 at 1–2.)  An official at the jail placed A. Cervantes in Pod A, Cell 10.  (*See*

8 Docket No. 1196 at 2.)  The government would not indict A. Cervantes on Count One of the Third

9 Superseding Indictment in this case until September 17, 2015.  (Docket No. 724.)

10        Pursuant to Assistant U.S. Attorney Leung's request, the BOP moved PW2 to the Northern

11 District of California, and, in transporting him, placed PW2 at a facility in Pahrump, Nevada, where

12 PW2 met Larez.   (Mtn. at 2.)  Neither the U.S Attorney's Office for the Northern District of

13 California nor the FBI control, or are informed of, the timing, transportation details, or placement

14 of inmates while they are in the process of being transferred.  (*See* 6/10/16 Transcript at 5059–60,

15 5089–90.)  While in Pahrump, PW2 indicated to Larez that he remained an active Norteño.  (*See*

16 Docket No. 1140 at 1.)  Larez allegedly made incriminating statements to PW2.  (*See id.* at 1–2.)

17 Larez also allegedly told PW2 that A. Cervantes was at Glen Dyer Jail.  (*See id.*)

18        In August 2015, after two weeks in Pahrump, Nevada, the BOP transferred PW2 to Glen

19 Dyer Jail.  (*See* Mtn. at 2; Docket No. 1140 at 2.)  Upon arrival at Glen Dyer Jail, PW2 advised

20 Alameda County Sheriff Deputy Sean Sullivan that he was a "dropout" and requested placement in

21 Protective Custody.  (*See* 6/10/16 Transcript at 5017–20.)   Because PW2 had not been verified as a

22 dropout at Glen Dyer Jail, nor had he previously been in Protective Custody at Glen Dyer, Deputy

23 Sullivan did not initially place PW2 in Protective Custody.  (*See id.* at 5018–19 ("An inmate would

24 be placed in Protective Custody if [he] had one documented history in [Protective Custody] with

25 [Glen Dyer], or if [Glen Dyer] called . . . another prison to verify that they actually had history in

26 [Protective Custody] at one point or another.").)   In determining where to place PW2, Deputy

27

28

United States District Court
Northern District of California

1  Sullivan learned that PW2 wanted to be placed in Administrative Segregation next to A. Cervantes

2  to get information from him.  (*Id.* at 5020.)

3      Deputy Sullivan called Special Agent Dutton about PW2 to "verify [PW2]'s story" about

4  cooperating with the federal government and determine where to place PW2 at Glen Dyer Jail.  (*Id.*

5  at 4999–5000.)  Deputy Sullivan learned from Special Agent Dutton that PW2 was "cooperating

6  with the federal government."  (*Id.* at 5000, 5005.)   Although the testimony on this point was

7  inconsistent, the Court will assume for purposes of this Order that Deputy Sullivan stated PW2's

8  desire to be housed next to A. Cervantes to Special Agent Dutton.  (*Id.* at 5001.)[3]

9      The Court finds that Special Agent Dutton's response to Deputy Sullivan's phone call was

10  to say that PW2 already had dropped out of the Norteño gang and "that he should probably be

11  housed appropriately based on that dropout status."  (*Id.* at 5049.)  Special Agent Dutton "wanted to

12  make sure [that Deputy Sullivan and the Sheriff's Office] were aware [PW2] was a dropout. . . .

13  [a]nd . . . that he should be housed appropriately . . . in accordance with their policies and their

14  procedures."  (*Id.* at 5050.)  Special Agent Dutton "advised Deputy Sullivan that [PW2] was a

15  dropout, and that it potentially could be a safety issue if [PW2] was housed with active [gang

16  members]."  (*Id.* at 5066.)

17      The Court also finds that Deputy Sullivan decided not to place PW2 in Protective Custody

18  and decided to place PW2 in a cell "right next to" A. Cervantes's, and did so on the basis of a

19

20  _____

[3] Deputy Sullivan gave inconsistent answers about whether he told Special Agent Dutton
about A. Cervantes.  Initially, Deputy Sullivan did not recall whether he said to Special Agent
21  Dutton that PW2 wanted to be housed next to A. Cervantes, (*id.* at 5000–01), but on the subsequent
question ("You don't remember if you told Special Agent Dutton that [PW2] wanted to be housed
22  next to [A.] Cervantes") said, "No, I am sorry, I did.  Yeah, I did tell him that," (*id.* at 5001).
Deputy Sullivan later testified that he "d[id]n't think [A.] Cervantes's name came up in the
23  conversation [with Special Agent Dutton]."  (*Id.* at 5021.)  Yet, confronted with his earlier
testimony, he testified, "If that is what I said, then, yes, that's correct," (*id.* at 5022–23), and then
24  testified that he "would say yes" to the question of whether A. Cervantes's name came up in the
conversation with Special Agent Dutton (*id.* at 5023).  Special Agent Dutton later confirmed that
25  Deputy Sullivan brought up A. Cervantes's name albeit without remembering "exactly what . . .
Sullivan said," (*see id.* at 5066 ("Deputy Sullivan mentioned that [PW2] felt comfortable that he
26  could be housed with active Norteños; Northerners."); *id.* at 5068 (explaining that Deputy Sullivan
said that PW2 "said he felt comfortable being housed with active Northern gang members,
27  including [A.] Cervantes").)

28

United States District Court
Northern District of California

1  consideration that PW2 "said he would like to be placed next to [A.] Cervantes because he wanted

2  to get information from him," (*id.* at 5020; *see id.* at 5009–10).  Deputy Sullivan testified that his

3  conversation with Special Agent Dutton did not affect his own decision to house PW2 in a cell next

4  to A. Cervantes, but Deputy Sullivan "believe[s]" that, if Special Agent Dutton "had told [him] not

5  to house [PW2] next to [A.] Cervantes," such a statement would have given Deputy Sullivan some

6  cause for concern.  (*Id.* at 5003.)  Based on Special Agent Dutton's testimony, the Court finds that

7  at most, the Deputy Sullivan's reference to A. Cervantes was no more than passing.

8  PW2 testified, in line with other testimony provided by other witnesses at trial, that new

9  arrivals to a facility are questioned by others detained at the jail to determine the new arrivals'

10  loyalties.  (*See id.* at 5147.)  Here, A. Cervantes initially asked PW2 questions.  (*See id.*)  Within

11  the first couple of weeks of being housed next to one another at Glen Dyer Jail, the two established

12  a sufficient rapport that A. Cervantes shared an admission with PW2 which is the subject of these

13  proceedings, namely that he was involved in the *Nuestra Familia* and that he ordered a "hit" on a

14  particular inmate.  (*See* Docket No. 1196 at 4–5; 6/10/16 Transcript at 5152–53, 5159.)

15  In September 2015, after PW2 had met with counsel, Assistant U.S. Attorney Leung spoke

16  with PW2's counsel in-person.  (6/10/16 Transcript at 5082–83.)  At that meeting, Assistant U.S.

17  Attorney Leung discussed the potential for Rule 35 relief and PW2's safety.  (*Id.* at 5082.)  Counsel

18  also told Assistant U.S. Attorney Leung that PW2 had "met an NF Defendant named Bird and had

19  information about Bird."  (*Id.* at 5083.)  Assistant U.S. Attorney Leung was not aware that PW2

20  had information about A. Cervantes or Larez until counsel mentioned Bird, a name associated with

21  Larez.  (*Id.* at 5088.)

22  Assistant U.S. Attorney Leung met with PW2, PW2's counsel, and an FBI case agent for

23  this case (Special Agent Nimmo), on October 1, 2015.  (*Id.* at 5085–87.)  That session was

24  Assistant U.S. Attorney Leung's first meeting with PW2 since PW2's sentencing in 2013.  (*Id.* at

25  5091.)  "At that meeting, [PW2] signed a proffer agreement for the first time."  (Docket No. 1196

26  at 4.)  At that proffer session, "[PW2] suggested should he be housed near Norteños because he

27  would get more information, and [Assistant U.S. Attorney Leung and others] told him no."  (*Id.* at

28

7

United States District Court
Northern District of California

1    5086.)  That session primarily involved discussion about individuals indicted in this case.  (*Id.* at

2    5088.)  That session did not result in a formal written cooperation agreement.  (*Id.* at 5092–93.)

3          On October 2, upon request from the government, Glen Dyer Jail officials changed PW2's

4    cell placement.  (Docket No. 1196 at 4.)

5          II.    *MASSIAH* **STANDARD**

6          "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of

7    Counsel for his defence."  U.S. Const. amend. VI.  "Once a defendant's Sixth Amendment right to

8    counsel has attached, the government is forbidden from 'deliberately eliciting' incriminating

9    statements from the defendant."  *Randolph v. People of the State of Cal.*, 380 F.3d 1133, 1143 (9th

10   Cir. 2004) (quoting *Massiah*, 377 U.S. at 206).  "This prohibition has been extended to the use of

11   jailhouse informants who relay incriminating statements from a prisoner to the government."  *Id.*;

12   *see United States v. Henry*, 447 U.S. 264, 270 (1980).  "In order to prevail on a *Massiah* violation,

13   the defendant must show that: (1) the informant was acting as an agent of the State when he

14   obtained the incriminating statements; and (2) the informant made some effort to stimulate

15   conversations about the crime charged."  *Williams v. Davis*, 2016 WL 1254149, at *15 (C.D. Cal.

16   Mar. 29, 2016) (citing *Randolph*, 380 F.3d at 1144).

17         "The Sixth Amendment guarantees the accused, at least after the initiation of formal

18   charges, the right to rely on counsel as a 'medium' between him and the State."  *Moulton*, 474 U.S.

19   at 176.  In light of this guarantee the Court observed that "knowing exploitation by the State of an

20   opportunity to confront the accused without counsel being present is as much a breach of the

21   State's obligation not to circumvent the right to the assistance of counsel as is the intentional

22   creation of such an opportunity," *id.*, and that "the Sixth Amendment is violated when the State

23   obtains incriminating statements by knowingly circumventing the accused's right to have counsel

24   present in a confrontation between the accused and a state agent," *id.* (adding in a footnote that

25   "proof that the State 'must have known' that its agent was likely to obtain incriminating statements

26   from the accused in the absence of counsel suffices to establish a Sixth Amendment violation").

27   "Moreover, the concept of a knowing and voluntary waiver of Sixth Amendment rights does not

28

1   apply in the context of communications with an undisclosed undercover informant acting for the

2   Government." *Henry*, 447 U.S. at 273.

3          "If, in fact, the State placed [an individual] in a cell with [a defendant] after he indicated his

4   willingness to cooperate with the prosecution, the State 'intentionally create[d] a situation likely to

5   induce [the defendant] to make incriminating statements without counsel's assistance.'" *Randolph*,

6   380 F.3d at 1146 (quoting *United States v. Kimball*, 884 F.2d 1274, 1278 (9th Cir.1989)); *see also*

7   *id.* at 1144 ("*Henry* makes clear that it is not the government's intent or overt acts that are

8   important; rather, it is the 'likely . . . result' of the government's acts." (quoting *Henry*, 447 U.S. at

9   271)).  In such a circumstance, "[the prosecution] t[akes] the risk that [the individual] might

10  'deliberately elicit' information from [the defendant] within the meaning of *Massiah* and *Henry* and

11  that such information would be excluded at trial." *Id.* at 1146.  *Cf. Henry*, 447 U.S. at 266 (noting

12  that an informant "informed [an FBI agent] that he was housed in the same cellblock with several

13  federal prisoners awaiting trial, including [the defendant]"); *id.* at 268 (noting that FBI "agent's

14  affidavit also stated that he never requested anyone affiliated with the . . . city jail to place [the

15  informant] in the same cell with [the defendant]").

16         In *Randolph*, representatives of the government told an informant "not to expect a deal in

17  exchange for his testimony." *Randolph*, 380 F.3d at 1144.  Still, "an explicit agreement to

18  compensate [an informant] [wa]s not necessary to a finding that [the informant] acted as an agent of

19  the State." *Id.*  In that case, "there [wa]s substantial evidence to support a conclusion that [a deputy

20  district attorney] and [a detective] knew or should have known that [the informant] believed that he

21  would receive leniency if he elicited incriminating statements from [a defendant], circumstances

22  sufficient to make [the informant] a government agent." *Id.* at 1146; *see also id.* at 1137 ("We hold

23  that if the State places a cooperating informant in a jail cell with a defendant whose right to counsel

24  has attached, and if the informant then makes a successful effort to stimulate a conversation with

25  the defendant about the crime charged, the State thereby violates the defendant's Sixth Amendment

26  rights . . . .").  By contrast, "the Sixth Amendment is not violated whenever—by luck or

27  happenstance—the State obtains incriminating statements from the accused after the right to

28

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1   counsel has attached." *Maine v. Moulton*, 474 U.S. 159, 176 (1985); *see also Randolph* 380 F.3d at

2   1144 (quoting *Moulton* to state: "Any statements, however, made by [a defendant] before [an

3   informant] met with the prosecution team cannot be the basis of a *Massiah* violation.").

4       Next, regarding an informant's behavior, a defendant must show "some effort to 'stimulate

5   conversations about the crime charged.'" *Randolph*, 380 F.3d at 1144 (quoting *Henry*, 447 U.S. at

6   271 n.9). "Notably, 'stimulation' of conversation falls far short of 'interrogation.'" *Id.* (citing

7   *Fellers v. United States*, 540 U.S. 519, 522–25 (2004)). The *Randolph* court considered that an

8   informant asked questions of a defendant about a crime when the defendant talked about the crime

9   and "further encouraged [the defendant] to provide information by 'being friendly and talkative.'"

10  *Id.* at 1146; *see also id.* ("In response to the question, 'Did you lead [the defendant] on to provide

11  you with information?' [the informant] testified, 'Of course. Yes.'"). By contrast, *Kuhlmann v.*

12  *Wilson*, 477 U.S. 436 (1986), involved no such stimulation because "the trial court concluded that

13  the statements made by the defendant to the informant were 'unsolicited' and 'spontaneous.'" *Id.* at

14  1143 (quoting *Kuhlmann*, 477 U.S. at 440 (noting that the trial court found that the informant "'at

15  no time asked any questions with respect to the crime,' . . .")).

III.   **APPLICATION OF *MASSIAH* REGARDING WHETHER PW2 ACTED AS AN AGENT OF THE GOVERNMENT**

18  As discussed below, the Court concludes that defendant A. Cervantes has failed to show

19  that PW2 was acting as an agent of the government at the time of the admission at issue. Because

20  the Court's conclusion in this regard is dispositive, the Court need not reach the parties' additional

21  arguments under *Massiah* or those regarding whether the statements at issue were incriminating as

22  to a charge pending against A. Cervantes in August 2015.

23  A. Cervantes argues that PW2 first became an agent of the government as a result of

24  debriefing six times with Agent Myers, and was an agent at least as of the time he left the BOP

25  facility in Arkansas. Specifically, A. Cervantes asserts that, because the BOP "has acted as the lead

26  investigative agency" (Dkt. No. 1251 at 6) in this case as to A. Cervantes, PW2 first met with

27  members of the "prosecution team" for purposes of *Randolph* and *Massiah* when PW2 met with

28

United States District Court
Northern District of California

1   BOP Investigative Agents in Arkansas and expressed his desire to provide information about

2   Norteño activity and drop out of the gang. (*See id.* at 6–8.). Further, he argues that PW2 was an

3   agent upon being brought to this District in August 2015, because PW2 "expected to receive

4   consideration from the government when he asked to be housed next to [A.] Cervantes," and "the

5   government had already begun fulfilling its part of the agreement with PW2," by arranging PW2's

6   transfer from Arkansas to the Northern District of California, where PW2 previously had resided

7   and been arrested. (*Id.* at 6; *see also* 6/14/2016 Transcript at 5192–94.) A. Cervantes also relies on

8   *United States v. Fort*, 472 F.3d 1106, 1110-13 (9th Cir. 2006), and its interpretation of "other

9   government agent in connection with investigating or prosecuting the case," Fed. R. Crim. P. 16.

10  *See also United States v. Fort*, 478 F.3d 1099, 1105–06 (Wardlaw, J., dissenting from denial of

11  rehearing en banc). *Cf. Kyles v. Whitley*, 514 U.S. 419, 437–39 (1995); *United States v. Cerna*, 633

12  F. Supp. 2d 1053, 1059 (N.D. Cal. 2009) ("The official press releases in this case made clear that at

13  least four *federal* agencies must be deemed 'agents' involved in the investigation for *Brady*

14  purposes, namely ICE, DEA, FBI and ATF.") (emphasis in original). Finally, A. Cervantes

15  presented an additional theory that Special Agent Dutton acquiesced in Deputy Sullivan's

16  placement of PW2 next to A. Cervantes after telling Deputy Sullivan that A. Cervantes was

17  cooperating with the government. (*See* 6/14/16 Transcript at 5194; Dkt. No. 1251 at 4.) *Cf. Henry*,

18  447 U.S. at 270 (explaining that an individual had been a government informant and "the FBI agent

19  was aware that [the individual] had access to [the defendant] and would be able to engage him in

20  conversations without arousing [the defendant]'s suspicion").

21       The Court disagrees. Unlike the record in *Randolph*, A. Cervantes fails to provide sufficient

22  facts from which the Court can conclude that an implicit agency relationship existed between PW2

23  and the government. When PW2 arrived at Glen Dyer Jail, the government had decided only to

24  move PW2 to this District to facilitate communications between PW2 and his lawyer, and to

25  facilitate PW2 providing information to the government in connection with PW2 having dropped

26  out of the Norteños and his possible knowledge of prior unsolved crimes involving Norteños in the

27  North Bay. The Court concludes that this decision to transfer PW2 is too attenuated from PW2's

28

11

United States District Court
Northern District of California

1   subjective desire to collect information about A. Cervantes or Sullivan's decision to place PW2 in

2   proximity to A. Cervantes to support a conclusion that either Agent Myers or Assistant U.S.

3   Attorney Leung or Special Agent Dutton "either knew or should have known that [PW2] hoped that

4   he would be given leniency if he provided useful testimony against [A. Cervantes]," *Randolph*, 380

5   F.3d at 1144.  *See also id.* at 1147; (noting that "there [wa]s substantial evidence to support a

6   conclusion that [a prosecutor and a detective] knew or should have known that [an informant]

7   believed that he would receive leniency if he elicited incriminating statements from [a defendant],

8   circumstances sufficient to make [the informant] a government agent").  In turn, the Court

9   concludes that A. Cervantes did not establish that the government "intentionally created a situation

10  likely to induce [A. Cervantes] to make incriminating statements without counsel's assistance,"

11  *Randolph*, 380 F.3d at 1146 (quoting *Kimball*, 884 F.2d at 1278).  *Cf. Henry*, 447 U.S. at 272 n.8

12  (noting that it was significant and "clear that the agent in his discussions with [the informant]

13  singled out [the defendant] as the inmate in whom the agent had a special interest").  Ninth Circuit

14  law is well established that PW2's subjective beliefs and desires alone to cooperate are insufficient

15  to make him an agent of the government.  *See Fairbank v. Ayers*, 650 F.3d 1243, 1248 (9th Cir.

16  2011) (noting in AEDPA case that "even if [the informant] subjectively believed that the officer's

17  statement as to the murder weapon was a request, this does not constitute the requisite state

18  involvement . . . .").  The mere fact that these individuals knew PW2 was a Norteño does not mean

19  that their decision to transfer PW2 to this District likely would lead to PW2's access to A.

20  Cervantes or PW2 stimulating conversations about A. Cervantes's prior activities involving the

21  *Nuestra Familia* and Norteños.

22       Further, the Court declines to apply the reasoning in *Fort*, 472 F.3d at 1110–13, regarding

23  Federal Rule of Criminal Procedure 16(a)(2) to this case to conclude that the government violated

24  *Massiah*.  The actions through August 2015 of the Assistant U.S. Attorney, FBI Special Agent, and

25  BOP Special Investigative Agent show they intended to facilitate the possibility of PW2 providing

26  information about unsolved crimes involving Norteños in the North Bay, without sufficient

27

28

1  evidence to support a finding that they intended to facilitate PW2 providing useful testimony

2  against A. Cervantes in this case.

3       IV.    **CONCLUSION**

4       For the foregoing reasons, the Court **DENIES** A. Cervantes's motion *in limine* to exclude his

5  alleged admissions under *Massiah*.  This order terminates Docket Nos. 1137 and 1259.

6       **IT IS SO ORDERED**.

7  Date: June 15, 2016

8  _____
   **YVONNE GONZÁLEZ ROGERS**

9  **UNITED STATES DISTRICT COURT JUDGE**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

13